THE FRANK R. GIBSON.

THE CYCLONE.

THE FITZPATRICK.

BAKER v. THE CYCLONE.

(District Court, N. D. New York. March 25, 1898.)

COLLISION WITH DOCK—DRIFTING VESSELS.

A schooner was moored by means of ropes to the breakwater of the Erie Basin, and her cargo was being transferred to a canal boat by a floating elevator. The elevator was held in position at the side of the schooner by lines thrown out to her, and also by means of four oak spuds driven into the ground, one at each corner; and the canal boat was lashed to her. The wind was blowing a gale, and parted the forward lines of the schooner, and she drifted around, carrying the other boats with her, until at right angles with the breakwater. The foreman of the elevator having failed to cut the lines that held the elevator to the schooner, although requested, the master of the schooner cut them, and she was safely removed. The elevator and barge then soon drifted across the basin, colliding with a dock, and both were damaged. *Held*, the canal boat was not at fault; that the schooner, having placed the vessels in a dangerous position, was at fault in cutting the lines at the time and manner shown; and that the elevator was at fault in making no effort to secure herself by additional lines, or procure assistance, though she had time and opportunity to do so, prior to the cutting of the ropes; and both were jointly liable for the damage done the canal boat.

The libel was filed by William F. Baker against the Cyclone in January, 1895, to recover damages in the sum of $925 sustained by the canal boat Frank R. Gibson by reason of the alleged negligence of the Cyclone. In June, 1895, the Fitzpatrick was brought in on petition filed by the Cyclone alleging that the accident was the result of the negligence of the Fitzpatrick which caused the damages to the canal boat, not only, but also to the Cyclone in the sum of $1,191. The Fitzpatrick duly filed an answer denying negligence on her part, and charging that the accident resulted from the negligence of the Cyclone and the canal boat.

Josiah Cook, for libelant.

John L. Romer, for the Cyclone.

Harvey L. Brown and Harvey D. Goulder, for the Fitzpatrick.

COXE, District Judge. The accident which caused the damages complained of occurred October 14, 1893. The Gibson was an ordinary canal boat, 96 feet long and about 17½ feet beam, having no motive power of her own. The Cyclone was a floating elevator, 82 feet long, 36 feet beam and about 4½ feet draught. She had

square ends and a flat bottom. On the center of this scow was built a tower 40 feet high, 35 feet square at the base and 25 feet at the top. There was a yoke, and two slides running up to a height of 104 feet above the deck, in which the elevator's leg was raised and lowered. She was anchored by means of four spuds, one at each corner. These spuds were of white oak 12 inches square and 35 feet long. The elevator would move up and down on these spuds as the water rose and fell, the ends of the spuds being imbedded in the mud. The Fitzpatrick was a four-masted schooner, 240 feet long, 41 feet beam and $16\frac{1}{4}$ feet draught, when loaded. At the time in controversy the Cyclone was lying near the southerly end and on the east side of the Erie Basin breakwater, which was her usual place for transacting business. The breakwater is a stone wall about three-quarters of a mile long, 50 feet wide and from 12 to 16 feet above the level of the lake when the water is in a normal condition. On the inner side of the wall at intervals of 56 feet large iron rings are placed in staples anchored in the wall so that vessels can moor there. These rings are $6\frac{1}{2}$ inches in diameter on the inside. The Erie Basin had gradually fallen into disuse and had filled up with mud and silt, but a channel had been dredged for the accommodation of the Cyclone 125 feet wide, 18 feet deep and long enough to enable large vessels to lie there and unload. On the 13th of October, 1893, the Fitzpatrick was sent to the breakwater to have her cargo of corn transferred to canal boats by the Cyclone. She was moored by means of lines through the rings. The elevator was anchored just east of the schooner and about midships. She also had lines out to the schooner. The canal boat was east of the elevator and lashed to her. The elevator was thus between the schooner and the canal boat, her leg being on the one side and her discharge spouts on the other. The work of unloading was not entirely completed on the 13th of October, and was resumed on the morning of the 14th at 7:30 o'clock, continuing for about an hour. The wind was blowing a gale down the lake on the morning of the 14th, and increased in velocity until it caused the forward lines of the Fitzpatrick to part, with the result that she struck the elevator with sufficient force to break her spuds, and the two vessels, with the canal boats moored to the elevator, drifted around until the Fitzpatrick was nearly at right angles with the breakwater, her bow extending into the shallow water to the east of the dredged channel. She remained in this position, held by her stern lines to the breakwater, until about 3 o'clock, when she was pulled out of danger by three tugs which were sent to assist her. The tugs first attempted to pull the schooner and elevator around to their original position at the breakwater, but after working for some time without success the master of the schooner notified the foreman of the elevator to cast off the lines which held the elevator to the schooner. The foreman having refused or neglected to do this, the master of the schooner cut the lines, and the tugs immediately thereafter released the schooner and towed her to a place of safety. The two lines which the elevator had to

the breakwater soon parted after the lines to the schooner were cut, and she drifted across the Erie Basin, and collided with the dock on the opposite side, causing damage to the canal boat and to herself. The following diagrams are prepared by the court simply as illustrations. They are not drawn to a scale, and are introduced solely to make the situation more intelligible. No. 1 shows the vessels when moored to the breakwater, No. 2. after the Fitzpatrick's lines were parted and she had swung around at right angles to the breakwater:

**No. 1.**

**No. 2.**

## The Gibson.

No negligence is imputed to the canal boat, except that she was not sufficiently manned. This proposition cannot be maintained either on the law or the facts. Two persons were aboard at the time, a sufficient number for all ordinary contingencies. It is said that if her captain or steersman had been on board she might have been cut loose, and so have avoided the accident. But this is highly problematical. She had no notice that the lines from the elevator to the schooner were to be cut. Apparently her safest course after the elevator was adrift was to remain where she was. Had she cast off her lines she might have encountered more serious difficulties. She had no means of propulsion, and might have drifted helplessly upon the rocks or sunken wrecks of "the middle ground." She certainly would have collided with something. In these circumstances she was not at fault in maintaining her position.

## The Fitzpatrick.

It must be conceded that the initial cause of the accident was the parting of the schooner's head lines. Had these held, the vessels would have been perfectly safe. The schooner was sheltered from the wind, to some extent, by the breakwater, which must have been from six to ten feet above the water of the basin. The schooner's side was about nine feet above the breakwater. That her lines parted affords a presumption that they were insufficient. When the schooner swung around she carried the Cyclone with her. The latter's spuds were broken, and it is a fair presumption that this was caused by the schooner striking against her. No other sufficient cause is proved or suggested. The elevator was then helpless, made so by the act of the schooner. Their relative obligations were thus changed, and it cannot be asserted that after depriving the elevator of her principal means of anchorage the schooner owed her no greater obligation than before. The master of the schooner testifies that he had all the lines out to the breakwater that it was possible for him to use. Assuming that he is correct in this statement, it was still his duty, having placed the elevator in a situation of danger, to act with discretion and prudence, and not subject her to additional and unnecessary risk. The schooner was not called upon to remain where she was, as the subsidence of the water would place her in great peril; but in releasing herself it was her duty not to subject the other vessels to danger which could have been avoided. Having informed the foreman of the elevator that "if he wished to take his own chances he could stay right alongside of the schooner," she should, if she intended to cut the lines, at least have given timely warning of her intention. The schooner was not justified in cutting the lines at the time and in the manner shown by the proof. The danger was not then imminent, and insufficient notice of the schooner's intention was given to the elevator. The latter had not sufficient time thereafter to secure other assistance or provide additional means of safety. If the elevator had known

.that her lines were to be cut, she might have taken a number of precautions to insure her against drifting across the basin. Had the canal boat known of this in time, she could have procured the services of a small tug and been towed to a place of safety.

### The Cyclone.

Assuming that the Cyclone was properly equipped for ordinary purposes, she certainly was in no condition to cope with the situation which confronted her on the morning in question. From the time she was swung around by the schooner, and rendered comparatively helpless by the breaking of her spuds, to the time when she was finally set adrift, six hours elapsed. During this time she did practically nothing to better her condition, except to put out an additional line. She had two lines to the breakwater, but she could have put out other lines. The foreman testified that he knew the lines he had out to the breakwater would not alone hold the elevator. There was a line several hundred feet in length on the elevator which was not used. This. could have been utilized, and any number of additional lines could have been procured. The Cyclone had no anchor. An anchor might have held her at least until she could have procured the assistance of a tug. That such assistance would have been available is demonstrated by the fact that after she drifted across the basin a tug got a line to her, and arrested her further progress. A tug came to her during the morning and offered help, but the offer was not accepted. The harbor of Buffalo was full of tugs, and one was lying near to assist the vessels when called on. After being warned repeatedly to do something to relieve the situation, the Cyclone persisted in doing nothing. The conclusion cannot be resisted that the accident was the result of the joint fault of the Fitzpatrick and the Cyclone. It follows that the libelant is entitled to a decree against the Fitzpatrick and Cyclone with costs. The Cyclone is entitled to a decree against the Fitzpatrick for half her damages and half her costs. There should be a reference to compute the amount due.